UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

NIGEL McCALL,

                                    Petitioner,

        -v-

ISAAC RIVERA, Superintendent, Coxsackie
Correctional Facility, and ANDREW M. CUOMO,
Attorney General of the State of New York,

                                    Respondents.

No. 05-CV-5583 (KMK) (MDF)

OPINION AND ORDER

Appearances:

Nigel McCall
Coxsackie, N.Y.
*Pro Se* Petitioner

John J. Sergi, Esq.
Joseph M. Latino, Esq.
Office of the District Attorney
White Plains, N.Y.
Counsel for Respondent Isaac Rivera

KENNETH M. KARAS, District Judge:

        Nigel McCall ("Petitioner"), proceeding pro se, brings this petition for a writ of habeas

corpus ("Petition") pursuant to 28 U.S.C. § 2254.  He challenges his New York state conviction,

by a jury verdict, on two counts of assault in the first degree, one count of criminal possession of

a weapon in the third degree, and one count of false personation.  Petitioner claims that: (i) his

conviction was obtained through the use of a "coerced confession"; (ii) his Equal Protection

rights were violated by the prosecutor's use of peremptory challenges during voir dire; (iii) the

convictions for first degree assault were not supported by the evidence; (iv) his trial counsel was

ineffective; and (v) his sentence of concurrent terms of imprisonment, the longest of which is

nineteen years, was harsh and excessive.  The case was referred to the Honorable Mark D. Fox

for review, pursuant to 28 U.S.C. § 636(b).[1]  Magistrate Judge Fox issued a Report and

Recommendation ("R & R"), recommending that this Court deny the Petition in its entirety.  For

the reasons stated herein, the Court adopts the R & R and denies Petitioner's claims for habeas

relief.

## I.  Background

The Court assumes the Parties' familiarity with the factual and procedural background of

this case as it is thoroughly set forth in the R & R, but the Court summarizes the following facts

most salient to Petitioner's objections.

On August 12, 2000, Petitioner entered the Dairyland Deli, located in Yonkers, New

York, and slashed Maher Thalgy, a store employee, on the left side of the face with a blade or

boxcutter.  Mr. Thalgy drove to a nearby hospital, were he received treatment.  After his arrest,

Petitioner participated in several proffer sessions with the Westchester County District

Attorney's Office during sessions often referred to as "Queen-for-a-Day" meetings.  At these

meetings, Petitioner told the District Attorney's Office that he slashed Mr. Thalgy in exchange

for $500 from a person named "GQ."  (R & R 4-5.)  After Petitioner testified before the Grand

Jury and gave statements contrary to the information provided at the proffer sessions,  Petitioner

was charged with perjury, but, as explained below, he was never tried on this charge.

Prior to trial, Petitioner moved in state court to suppress the incriminating statements he

made during the proffer sessions, alleging that the statements violated his right to protect against

---

[1] The case was initially assigned to the Honorable Colleen McMahon, who referred the matter to Magistrate Judge Fox on June 30, 2005.  The case was reassigned to this Court on August 6, 2007.

self-incrimination and also violated the agreement Petitioner made with the Assistant District Attorney ("ADA").  (Mem. of Law and Resp't's App. ("Resp't Mem.") Ex. A, at A24-25.)  At a *Huntley* hearing, ADA Robert Neary testified that he met with Petitioner and his then-attorney, Mr. Vincent DeMarte, on January 11, 2001 for a proffer session.  (Dec. 3, 2001 Tr. 17-21.)  ADA Neary testified that his understanding of a "Queen-for-a-Day" meeting is that a defendant can provide statements to law enforcement in an effort to cooperate, and that these statements cannot be used "directly" against the defendant in the prosecution's case-in-chief.  (*Id.* at 9.)  According to ADA Neary, at the beginning of the January 11, 2001 meeting, he told Petitioner that his statements "would not be used against him," without also specifying that the statements could be used for impeachment purposes.  (*Id.* at 20-21.)  ADA Neary also testified that he did not explicitly promise Petitioner that he could later perjure himself and avoid impeachment by statements made at the meeting.  (*Id.* at 26.)  ADA Neary further testified that in accordance with his general practice, he did not use a written proffer agreement, and that neither Petitioner nor his attorney asked for further clarification regarding the boundaries of the meeting.  (*Id.* at 10-11, 20-21.)  At the January 11th meeting, Petitioner made incriminating statements to ADA Neary, including stating that he had agreed to slash a victim in the face for $500.  (*Id.* at 21-24.)

In late February 2001, Petitioner agreed to attend a second "Queen-for-a-Day" meeting with the Westchester District Attorney's Office.  At this time, ADA Timothy Ward was prosecuting Petitioner's case because ADA Neary had discovered a conflict and removed himself from the case.  ADA Ward testified that his understanding of a "Queen-for-a-Day" meeting is also that the defendant's statements at the meeting cannot be used in the prosecution's case-in-chief, but if he later testifies differently than his statements, the statements can be used against him for impeachment.  (*Id.* at 48-49.)  According to ADA Ward, at the beginning of the

second proffer session, he told Petitioner that his statements would "not be used against [him] in any trial, any proceeding or any hearing," but explicitly warned Petitioner that if he did "testify differently as to what [he] told [ADA Ward] during th[e] conference, then whatever [he] told [ADA Ward] during th[e] conference w[ould] be used against [him]."  (*Id.* at 58.)  ADA Ward also testified that he asked Petitioner if he understood, that Petitioner spoke briefly with his attorney and said that he understood, and that Mr. DeMarte did not appear surprised by the warning.  (*Id.* at 58-59.)  ADA Ward further testified that after he gave this warning, Petitioner made incriminating statements, including that he agreed to slash a victim in the face in exchange for money.  (*Id.* at 60-63.)  Petitioner also viewed a photo array and attempted to identify the person who allegedly asked him to slash Mr. Thalgy, but, according to ADA Ward, Petitioner did not select the correct person.  (*Id.* at 66.)

On March 22, 2001, Petitioner participated in a third "Queen-for-a-Day" session with ADA Ward.  According to ADA Ward, at the beginning of this third meeting, he again warned Petitioner that although his statements could not be used against him, the statements would be used if he testified differently.  (*Id.* at 69.)  ADA Ward testified that Petitioner stated that he understood the warning.  (*Id.* at 70.)  After the warning, according to ADA Ward, Petitioner was again showed a photo array and again misidentified the person who paid Petitioner to slash Mr. Thalgy.  (*Id.* at 71.)  ADA Ward further testified that because Petitioner was not identifying the correct person, despite claiming that he knew the suspect, ADA Ward told Petitioner that his cooperation was no longer useful to the prosecution, and again warned Petitioner that his statements at the meeting could be used against him for impeachment.  (*Id.* at 71-72.)  ADA Ward also stated that he was aware, during the second and third proffer sessions, that ADA

Neary had previously met with Petitioner for a "Queen-for-a-Day" meeting, but that he was not given any other information about the boundaries of that meeting.  (*Id.* at 85.)

Petitioner's then-attorney, Mr. Demarte, and Petitioner also testified at the *Huntley* hearing and provided a drastically different version of the events.  Mr. Demarte testified that he had previously met with ADA Neary for proffer sessions with other clients and that ADA Neary had never previously told a defendant that his statements could not be used for impeachment. (*Id.* at 169-70.)  However, according to Mr. DeMarte, at the January 11, 2001 meeting, ADA Neary explicitly told Petitioner that anything he said during the meeting would be "confidential and not be used for any purpose at all."  (*Id.* at 155.)  Mr. DeMarte testified that he was surprised by ADA Neary's statement, (*id.* at 154-56), but that he did not seek clarification, (*id.* at 180). Regarding the second proffer session with ADA Ward, Mr. DeMarte first stated that he could not recall ADA Ward giving any warning or boundaries at the beginning of the meeting.  (*Id.* at 162.)  After the trial judge repeatedly asked Mr. DeMarte if this answer meant that he did not recall the warning but that it could have happened, Mr. DeMarte testified that he recalled that ADA Ward did not provide any warning.  (*Id.* at 162-63.)  Mr. DeMarte also testified that ADA Ward did not provide any warnings or explain the boundaries of the meeting at the beginning of the third "Queen-for-a-Day" session.  (*Id.* at 166.)  Mr. DeMarte testified that he purposefully did not discuss the ground rules with ADA Ward or inform him of ADA Neary's purported promise not to use Petitioner's statements for impeachment because the deal could not get "any better."  (*Id.* at 185-86.)  Mr. DeMarte further testified that ADA Ward did state, at the end of the third meeting, that Petitioner's statements could be used for impeachment, (*id.* at 166), but that Mr. DeMarte did not tell ADA Ward that this was not his understanding of the cooperation agreement, (*id.* at 189).

5

Similarly, Petitioner testified that, at the first meeting, ADA Neary told him that nothing he said would be used against him "in any proceeding" and that Petitioner's statements would not be "divulged outside of [the District Attorney's] office." (*Id.* at 203.) Petitioner also testified that ADA Ward did not provide any ground rules at the beginning of either the second or third proffer session. (*Id.* at 204-06.) According to Petitioner, when ADA Ward finally did warn him about the potential use of his statements for impeachment at the end of the third meeting, Petitioner did not object to ADA Ward's statement because his attorney told him not to speak anymore. (*Id.* at 222-24.)

After the *Huntley* hearing, Justice John M. Perone of the New York Supreme Court, Westchester County, found that at the first proffer session, ADA Neary told Plaintiff that his statements at the meeting "could not be used against him [in the prosecution's] case in chief," without warning him that his statements could be used to impeach him if he later provided inconsistent testimony. (*Id.* at 51; Resp't Mem. Ex. D, at D2.) The trial court "gave full credence" to the testimony of the District Attorney's witnesses (Resp't's Mem. Ex. D, at D6), and found that ADA Ward "did give the two warnings before the February meeting" and gave the warnings three times during the second and third proffer sessions, (*id.*; Dec. 4, 2001 Tr. 26.)[2] Justice Perone explained that he found that ADA Ward had explicitly warned Petitioner, at the beginning of the two proffer sessions, that his statements could be used for impeachment purposes. (Dec. 4, 2001 Tr. 26.) Justice Perone further ruled that "no force or intimidation was used by law enforcement," and that Petitioner's statements were "voluntarily made on the advice of counsel." (Resp't's Mem. Ex. D, at D5.) As a result, Justice Perone allowed the District

---

[2] The record contains two transcripts dated December 4, 2001. References herein are to the shorter version, which contains only the trial court's oral ruling. It is docket number 13.

Attorney's office to use Petitioner's statements for impeachment purposes regarding the assault charges. (*Id.* at 6-7.)[3]

Petitioner did not testify at trial, and, as a result, none of Petitioner's proffer statements was used at trial. The jury convicted Petitioner of two counts of assault in the first degree, one count of criminal possession of a weapon in the third degree, and one count of false personation. On June 5, 2002, Justice Richard A. Molea of the New York Supreme Court, Westchester County, sentenced Petitioner to concurrent terms of imprisonment, the longest of which is a term of nineteen years.

On June 10, 2003, Petitioner appealed to the Appellate Division, Second Department, arguing that his statements should have been suppressed because they were obtained in violation of N.Y. C.P.L.R. § 60.45 and the Fifth Amendment. (Resp't Mem. Ex. E, at E33.)[4] Petitioner also argued that the trial court had violated his Sixth Amendment right by denying his three so-called *Batson* challenges regarding the ADA's use of peremptory challenges against African-Americans, and that the evidence did not support the convictions because, among other reasons, the evidence did not support a finding of serious physical injury required for first degree assault. (Resp't Mem. Ex. E, at E38-49.) On December 15, 2003, the Appellate Division affirmed Petitioner's conviction, finding that the trial court had "properly ruled that the defendant's

---

[3] Justice Perone also allowed the District Attorney's office to use Petitioner's statements against him in the prosecution's direct case on the perjury count that had been brought against Petitioner after he testified in the Grand Jury. (Dec. 4, 2001 Tr. 26-27.) The trial court also severed the perjury count from the other charges. (*Id.* at 36.) The perjury count was never tried and does not form the basis of any of Plaintiff's habeas claims.

[4] N.Y. C.P.L.R. § 60.45 provides that a "confession, admission or other statement is involuntarily made . . . when it is obtained . . . by means of any promise . . . [that] creates a substantial risk that the defendant might falsely incriminate himself." N.Y. C.P.L.R. § 60.45.

statements . . . could be used for impeachment purposes" and that the record showed that Petitioner "was properly warned, prior to his testimony before the Grand Jury . . . that [the] statements could be used [] for impeachment purposes." *People v. McCall*, 769 N.Y.S.2d 566, 567 (App. Div. 2003). The Appellate Division also held that Petitioner's "remaining contentions [were] without merit." *Id.* On April 20, 2004, the New York State Court of Appeals denied Petitioner leave to appeal. *People v. McCall*, 811 N.E.2d 44 (N.Y. 2004). Petitioner did not pursue any state collateral attacks on his convictions.

On June 14, 2005, Petitioner filed the instant Petition, claiming that the state courts' rulings were contrary to or an unreasonable application of clearly established Supreme Court precedent because: (1) his convictions were obtained with the use of a "coerced confession" that violated N.Y. C.P.L.R. § 60.45; (2) the prosecutor's use of peremptory challenges violated *Batson*; (3) his trial counsel was ineffective; (4) the weight of the evidence did not support his convictions for assault in the first degree; and (5) his sentence was harsh and excessive. After Respondent filed its opposition to the Petition arguing, among other things, that Petitioner had failed to exhaust his third and fifth grounds for habeas relief, Petitioner requested a stay in order to pursue state remedies. (Mem. Order of Magistrate Judge Mark D. Fox, dated May 9, 2006 ("Mem. Order"), unnumbered page 1.) Magistrate Judge Fox denied Petitioner's request, noting that "Petitioner ha[d] failed to explain how the claims are meritorious in light of the law and the underlying factual record," and "ha[d] not explained what stopped him from filing an application for writ of error *coram nobis* immediately after the proceedings on direct appeal were concluded." (*Id.* at unnumbered page 2.)

<u>II.  Discussion</u>

<u>A.  Standard of Review</u>

<u>1.  Review of Magistrate Judge's Report & Recommendation</u>

A district court reviewing a magistrate judge's report and recommendation "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge."  28 U.S.C. § 636(b)(1)(c); *see also Donahue v. Global Home Loans & Fin., Inc.*, No. 05-CV-8362, 2007 WL 831816, at *1 (S.D.N.Y. Mar. 15, 2007).  Under 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), parties may submit objections to the magistrate judge's report and recommendation.  The objections must be "specific" and "written," Fed. R. Civ. P. 72(b)(2), and must be made "[w]ithin 14 days after being served with a copy of the recommended disposition," *id*.; *see also* 28 U.S.C. § 636(b)(1), plus an additional three days when service is made pursuant to Fed. R. Civ. P. 5(b)(2)(C)-(F), *see* Fed. R. Civ. P. 6(d), as was the case here.

Where a party submits timely objections to a report and recommendation, as Petitioner has here, the district court reviews de novo the parts of the report and recommendation to which the party objected.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(3); *Donahue*, 2007 WL 831816, at *1.  The district court "may adopt those portions of the . . . report [and recommendation] to which no 'specific written objection' is made, as long as the factual and legal bases supporting the findings and conclusions set forth in those sections are not clearly erroneous or contrary to law."  *Eisenberg v. New England Motor Freight, Inc.*, 564 F. Supp. 2d 224, 226 (S.D.N.Y. 2008) (quoting Fed. R. Civ. P. 72(b)(2)).

<u>2.  Habeas Corpus Under 28 U.S.C. § 2254</u>

"A federal court may not grant habeas relief to a state prisoner 'with respect to any claim that was adjudicated on the merits in State court . . . unless the adjudication of the claim . . .

9

resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States,' or 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Davis v. Grant*, 532 F.3d 132, 140 (2d Cir. 2008) (quoting 28 U.S.C. § 2254(d)).

"While the precise method for distinguishing objectively unreasonable decisions from merely erroneous ones is somewhat unclear, it is well-established in th[e Second] Circuit that the objectively unreasonable standard of § 2254(d)(1) means that petitioner must identify some increment of incorrectness beyond error in order to obtain *habeas* relief." *Sorto v. Herbert*, 497 F.3d 163, 169 (2d Cir. 2007) (internal quotation marks omitted). The state court's determinations of factual issues are presumed correct, and Petitioner has "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see also Hoi Man Yung v. Walker*, 468 F.3d 169, 176 (2d Cir. 2006).

"Ordinarily, a federal habeas court may not reach the merits if the state court's rejection of a federal claim rests on a state law ground that is independent of the federal question and adequate to support the judgment," including state procedural default. *Clark v. Perez*, 510 F.3d 382, 390 (2d Cir. 2008) (internal quotation marks omitted). "Specifically, when a petitioner failed to exhaust state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred, the federal habeas court should consider the claim to be procedurally defaulted." *Id.* (internal quotation marks omitted). However, "[a]n application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(2).

B.  Coerced Confession Claim

Petitioner's first claim for habeas relief is that his conviction was "obtained by use of a coerced confession," because ADA Neary, at the first proffer meeting, told Petitioner that nothing he said "would be used against [him] at anytime for any purpose," without stating that Petitioner's statements could be used for impeachment purposes.  (Petition ¶ 12(A).)  Magistrate Judge Fox concluded that "nothing about the circumstances of the 'Queen for a Day' meetings permits the finding or conclusion that Petitioner's statements were 'coerced,'" noting that Justice Perone's findings that the prosecution's witnesses were credible as to the events surrounding the meetings and that Petitioner's statements were made "'truthfully and voluntarily'" were "supported by the record."  (R & R 10-11.)  Petitioner objects to this conclusion, reiterating the arguments he made to Magistrate Judge Fox, such as that he testified to the Grand Jury "under the guise" that his statements could not be used against him, and that his right to testify at trial was hindered because the statements could be used for impeachment.  (Obj. unnumbered page 12, 16.)

As an initial matter, the Court notes that Plaintiff's claim rests on principles of due process and voluntariness, rather than on Fifth Amendment *Miranda* principles, as Petitioner has made no claim that he should have been read his *Miranda* rights before he offered his statements.  Indeed, Petitioner voluntarily participated in the proffer sessions with his attorney and it was clear that he could leave the session at any time.  (Dec. 3, 2001 Tr. 223.)  Generally, "courts evaluate whether a confession was the result of coercion by examining the 'totality of all the surrounding circumstances.'"  *Brown v. Purge*, No. 05-CV-3631, 2009 WL 3837308, at *5 (E.D.N.Y. Nov. 17, 2009) (quoting *United States v. Anderson*, 929 F.2d 96, 99 (2d Cir. 1991)).  The totality of the circumstances test applies to cases involving promises to the defendant —

11

"the presence of a direct or implied promise of help or leniency alone [does] not bar[] the admission of a confession where the totality of the circumstances indicates it was the product of a free and independent decision." *Green v. Scully*, 850 F.2d 894, 901 (2d Cir. 1988).  Factors to be considered include (1) the characteristics of the accused, such as experience and background, (2) the conditions of interrogation, such as the place and length of questioning and the presence of counsel, and (3) the conduct of law enforcement officials, "includ[ing] psychologically coercive techniques such as brainwashing or promises of leniency or other benefits." *Id.* at 901-02.

"[W]hen [] a defendant waives rights in reliance upon a government promise, due process requires that the defendant be entitled to have the government held to its end of the bargain." *United States v. Heatley*, No. 96-CR-515, 1999 WL 61816, at *8 (S.D.N.Y. Jan. 29, 1999); *see also United States v. Aleman*, 286 F.3d 86, 90 (2d Cir. 2002) (noting that "[d]ue process concerns color [courts'] interpretation of a contract involving [a] defendant's constitutional rights" and that "[d]ue process not only requires that the government adhere to the terms of" its bargain, "but also requires [courts] to construe agreements strictly against the government" (internal quotation marks and citation omitted)).  As a result, "a suspect's post-arrest statements may be deemed involuntary if induced by the government's unfulfilled or unfulfillable promises." *Heatley*, 1999 WL 61816, at *8.  "Cooperation agreements, like plea bargains, are interpreted according to the principles of contract law." *United States v. Erdil*, 230 F. Supp. 2d 292, 299 (E.D.N.Y. 2002) (internal quotation marks omitted); *see also United States v. Khan*, 920 F.2d 1100, 1105 (2d Cir. 1990) (noting that cooperation agreements are analyzed under contract principles and that the government cannot "turn its back" on promises made to a defendant); *United States v. Chan*, 185 F. Supp. 2d 305, 307 (S.D.N.Y. 2002) ("It is well settled

that pre-trial agreements, including proffer and cooperation agreements, are interpreted according to the principles of contract law.").

As noted, a state court's factual determinations regarding the events surrounding a confession, the existence of an agreement, and the credibility of witnesses are presumed correct on habeas review. *See Brown*, 2009 WL 3837308, at *5; *see also Shabazz v. Artuz*, 336 F.3d 154, 161 (2d Cir. 2003) (noting that § 2254(e)'s presumption of correctness applies to "[w]hether cooperation agreements exist[ed]" and "is particularly important when reviewing the trial court's assessment of witness credibility"); *Mateo v. Artus*, No. 05-CV-206, 2009 WL 3273878, at *9 (W.D.N.Y. Oct. 9, 2009) ("Subsidiary questions, such as the length and circumstances of an interrogation, or whether the police engaged in the intimidation tactics alleged by the defendant, are entitled to the presumption of correctness." (internal quotation marks and brackets omitted)). However, "[t]he 'ultimate issue of voluntariness of a confession is a legal question requiring independent federal determination.'" *Mateo*, 2009 WL 3273878, at *9 (quoting *Nelson v. Walker*, 121 F.3d 828, 833 (2d Cir. 1997)).

Turning first to the factual findings, the Parties agree that the trial court was reasonable in finding that ADA Neary did not warn Petitioner, at the first proffer meeting, that Petitioner's statements could be used against him for impeachment purposes. (Resp't's Mem. 7.) The record regarding what ADA Neary affirmatively promised Petitioner is somewhat less clear. After the *Huntley* hearing, Justice Perone found that ADA Neary told Petitioner that "anything he said in Queen for a Day could not be used against him in [the prosecution's] case in chief." (Dec. 4, 2001 Tr. 25.) However, in a later written opinion, Justice Perone found that ADA Neary promised Petitioner that his statements could not be used against him, without specifying anything about a case in chief. (Resp't Mem. Ex. D, at D6.) This second finding comports with

13

ADA Neary's testimony, in which he stated that he told Petitioner that his statements would not be used against him.  (Dec. 3, 2001 Tr. 20.)  Petitioner argues that ADA Neary explicitly promised that his statements would not be used for *any* purpose.  Petitioner also sharply disagrees with Justice Perone's finding that ADA Ward warned Petitioner, at the beginning of both the second and third proffer sessions, that his statements could be used for impeachment, arguing that Justice Perone should not have credited ADA Ward's testimony over his own or that of his attorney.

As already explained, the trial court's factual findings and credibility determinations are accorded great deference, and, here, there is no clear and convincing evidence rebutting the presumption that Justice Peron's credibility-based findings were incorrect.  *See Shabazz*, 336 F.3d at 161 (the "presumption of correctness is particularly important when reviewing the trial court's assessment of witness credibility"); *see also Saxon v. Ercole*, No. 06-CV-7728, 2008 WL 3446488, at *10 (S.D.N.Y. Aug. 12, 2008) (noting that, for purposes of habeas review, a state trial court's assessment of witness credibility at an evidentiary hearing is presumed correct).  First, ADA Ward unequivocally testified that he warned Petitioner about potential impeachment at the beginning of both proffers.  Second, although Petitioner's attorney eventually testified that such warnings were not given, he originally stated that he did "not recall" whether the warnings were given and only presented clearer testimony after subsequent questioning by the court.  (Dec. 3, 2001 Tr. 160-64.)  Furthermore, Mr. DeMarte's testimony was undercut by his admission that when ADA Ward did warn Petitioner, at the end of the third meeting, that inconsistent statements could be used against him, Mr. DeMarte did not object or question ADA Ward, or state that this was not his understanding of the agreement.  (*Id.* at 189.)  Moreover, Mr. DeMarte stated that he wrote a memorandum regarding the reasons he should be relieved as

14

Petitioner's counsel, including because he might be called as a witness to the proffer sessions, but testified that he did not write in that memorandum that it was his understanding that Petitioner's "statements could not be used against [him] should he testify at any hearing or trial." (*Id.* at 190.)  Similarly, Petitioner testified that, on the advice of his counsel, he did not protest when ADA Ward purportedly gave his only warning about impeachment at the end of the third proffer session.  (*Id.* at 223-24.)  In sum, the trial court was faced with starkly different versions of events from the witnesses and chose to credit ADA Ward's testimony.  Based on the record, and especially considering that Petitioner has failed to present clear and convincing evidence to the contrary, the Court finds that the trial court's findings were reasonable.  *See Pierce v. Lee*, No. 08-CV-1721, 2010 WL 2108456, at *8 (D. Conn. May 21, 2010) (rejecting habeas petitioner's claim that trial court's credibility finding was unreasonable because "[t]he state court was entitled to credit pretrial counsel's testimony over petitioner's").

Based on these facts, Petitioner reasonably believed that ADA Neary agreed not to use his statements for any purpose.  Even accepting ADA Neary's testimony, which the trial court credited, that ADA Neary simply told Petitioner that his statements could not be used against him (without specifying that it would not be used for *any* purpose), the terms of the agreement were ambiguous.  In other words, a reasonable person might interpret such a promise as including the use of statements for impeachment.  *See United States v. Parra*, 302 F. Supp. 2d 226, 236 (S.D.N.Y. 2004) (noting, in the context of interpreting a proffer agreement, that "language is ambiguous if it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire agreement").  Thus, considering that ambiguities are resolved against the prosecution, fairness dictates that it was reasonable for Petitioner to believe that his statements from the first proffer session would not be

15

used for any purpose. *See id.* (noting that "courts apply fairness principles to the terms of a proffer agreement"); *Heatley*, 1999 WL 61816, at *9-11 (reviewing the reasonableness of the defendant's understanding of promises made by the prosecution at proffer sessions, noting that courts "resolve any ambiguities in [an] agreement against the government"). As a result, there are serious questions as to whether Petitioner's statements from the first proffer session would have been admissible for impeachment under due process principles.

But this is not the end of the inquiry. Because the trial court reasonably found that Petitioner was explicitly warned at the beginning of the second and third proffer sessions that his statements could be used for impeachment purposes, his interpretation of the cooperation agreement as continuing to include a promise not to use his statements from the second or third meetings for any purpose was not reasonable. *See Aleman*, 286 F.3d at 90 ("Whether the agreement [between the government and a defendant] is written or oral, the court must determine what the parties reasonably understood to be its terms, including intended remedies in the event of a breach." (internal quotation marks omitted)); *Heatley*, 1999 WL 61816, at *9-11 (finding that the defendant's interpretation of promises made by the government at proffer sessions was not reasonable); *see also Parra*, 302 F. Supp. 2d at 236-37 (finding that the government could use proffer statements for impeachment purposes when the terms of the agreement were clear and unambiguous); *Chan*, 185 F. Supp. 2d at 307 (finding that the government could use the defendant's proffer statements for impeachment when the proffer agreement provided for such use). Put another way, based on the trial court's factual findings, Petitioner agreed to the changed terms of the proffer agreement, at least with respect to statements he made at the second and third proffer meetings. Moreover, Petitioner has not shown or even alleged that his statements at the second or third meeting were otherwise involuntary when the statements were

16

made in the presence of counsel, as Petitioner was not threatened or intimidated and admits that

he understood that he could stop the proffer session at any time.  *See Gainey v. Conway*, No.

08-CV-83, 2010 WL 2541760, at *7, *9 (W.D.N.Y. June 21, 2010) (finding that the petitioner's

confession was not involuntary when he was "not threatened or promised anything by the

police").  Accordingly, Petitioner has not shown that the state court's determination that his

statements at the second and third proffer sessions were not "coerced" and were, therefore,

admissible for impeachment, was contrary to or an unreasonable application of clearly

established Supreme Court precedent.

Moreover, even assuming that the trial court's suppression ruling was in error, such an

error was harmless when there is "no basis to conclude that the alleged error 'had [a] substantial

and injurious effect or influence in determining the jury's verdict' and that it actually prejudiced

[P]etitioner."  *Kotler v. Woods*, 620 F. Supp. 2d 366, 394 (E.D.N.Y. 2009) (quoting *Brecht v.

Abrahamson*, 507 U.S. 619, 623 (1993)); *see Fry v. Pliler*, 551 U.S. 112, 121-22 (2007) (holding

that federal courts reviewing habeas petitioners "must assess the prejudicial impact of

constitutional error in a state-court criminal trial under the "substantial and injurious effect"

standard" regardless of "whether or not the state appellate court recognized the error and

reviewed it for harmlessness"); *Bowen v. Phillips*, 572 F. Supp. 2d 412, 419 (S.D.N.Y. 2008)

(noting that "[a] state court's error is considered harmless unless it had substantial and injurious

effect or influence in determining the jury's verdict," and that "even if a Confrontation Clause

violation ha[d] occurred, a habeas corpus petition cannot be granted if the error was harmless").

"On habeas review, the prosecution bears the burden of persuasion on the issue of harmless

error."  *Bowen*, 572 F. Supp. 2d at 419.

Here, Petitioner's statements were not submitted to the jury at trial; rather, Petitioner's argument is that had the trial court suppressed the statements for impeachment purposes, he might have testified at trial.  However, Petitioner has not proffered any specific testimony that he wished to provide the jury that could conceivably have changed the outcome of the trial.  And Petitioner has not explained why he would have testified if his statements from the first proffer session were suppressed but those from the later proffer sessions were not — as this Court finds would have been proper.  Put another way, the record makes clear that the incriminating statements Petitioner made in the second proffer session, before which Petitioner was warned that any inconsistent statements could be used for impeach purposes, duplicated what Petitioner said in the first proffer session.  (*Compare* Dec. 3, 2001 Tr. 21-24 (Petitioner's statements at the first proffer meeting) *with* Dec. 3, 2001 Tr. 60-63 (Petitioner's statements during second proffers session).)

Thus, even if Petitioner's statements from the first proffer session should have been deemed off-limits, Petitioner would still have faced the same cross-examination based on the same prior inconsistent statements.  This makes any error harmless.  *See Arizona v. Fulminante*, 499 U.S. 279, 306-12 (1991) (holding that the use of coerced confessions at trial is subject to harmless error review); *accord Palmer v. Hendricks*, 592 F.3d 386 (3d Cir. 2010) (where petitioner alleges constitutional error based on trial counsel's failure to advise petitioner of the right to testify, "every authority we are aware of . . . requires the petitioner to 'show that [the deficient conduct] actually had an adverse effect on the defense'" (quoting *Strickland v. Washington*, 466 U.S. 688, 693 (1984) (alteration in original)).  Furthermore, the evidence at trial of Petitioner's guilt was overwhelming, with several eyewitnesses, including one person who knew Petitioner personally, identifying Petitioner as the assailant.  This provides additional

support for the conclusion that any error would necessarily have been harmless.  *See Kotler*, 620

F. Supp. 2d at 394 (denying habeas petition because even if admission of hearsay statements was

unconstitutional, trial error was harmless when the evidence of guilt was overwhelming).

    C.  *Batson* Claim

       Petitioner's second claim is that the trial court improperly sustained the prosecution's use

of peremptory challenges against three African-American jurors.  The Appellate Division

rejected Petitioner's *Batson* claim as "meritless," without further comment.  (Resp't Mem. Ex.

H.)  Magistrate Judge Fox recommended that Petitioner's *Batson* claim be dismissed because

Petitioner failed to show that the trial judge's acceptance of the prosecutor's race-neutral reasons

was contrary to or involved an unreasonable application of clearly established Supreme Court

precedent.  (R & R 11-13.)  Petitioner objects to Magistrate Judge Fox's conclusions, arguing

that the prosecutor's race-neutral reasons should not have been accepted.  (Obj. unnumbered

pages 18-21.)

       The Supreme Court has held that the Equal Protection Clause of the Constitution

prohibits prosecutors from exercising peremptory challenges against prospective jurors "solely

on the basis of race."  *Cousin v. Bennet*, 511 F.3d 334, 337 (2d Cir. 2008) (citing *Batson v.

Kentucky*, 476 U.S. 79, 89 (1986)).  In *Batson*, the Supreme Court articulated a three-step

process for challenging potentially-purposeful racial discrimination in a prosecutor's selection of

jurors.  *See Richardson v. Greene*, 497 F.3d 212, 214 (2d Cir. 2007) ("[E]very person has a right

to a trial before a jury impaneled without discrimination by race.").  First, the judge must

determine "whether the defendant has made a prima facie showing that the prosecutor exercised

a peremptory challenge on the basis of race."  *Batson*, 476 U.S. at 96-97; *see Overton v. Newton*,

295 F.3d 270, 276 (2d Cir. 2002) ("[I]n order to establish a *prima facie* case of discrimination, a

defendant must show facts and circumstances that raise an inference that the prosecutor used the peremptory challenge to exclude potential jurors from the petit jury on account of their race."). A prima facie case may be found when "a pattern of strikes against [African-American] jurors included in the particular venire might rise to an inference of discrimination," or when a "prosecutor's questions and statements during *voir dire* examination and in exercising his challenges may support or refute an inference of discriminatory purpose." *Batson*, 476 U.S. at 97. If a defendant meets his burden of showing a prima facie case, "the burden shifts to the State to come forward with a neutral explanation for challenging [African-American] jurors." *Id.* at 97; *see also McKinney v. Artuz*, 326 F.3d 87, 97-98 (2d Cir. 2003) (summarizing *Batson*'s burden-shifting framework). "Third, the court must then determine whether the defendant has carried his burden of proving purposeful discrimination." *Rice v. Collins*, 546 U.S. 333, 338 (2006). Although the trial court should evaluate "the persuasiveness of the justification" offered by the prosecution, "the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." *Purkett v. Elem*, 514 U.S. 765, 767-68 (1995) (per curiam). "[I]n the context of habeas review, 'a state court's determination whether a prosecutor's use of a peremptory challenge was motivated by discriminatory intent, in violation of *Batson*, is a factual determination and thus qualifies for the 28 U.S.C. § 2254(e) presumption of correctness.'" *Huggins v. Girdick*, No. 03-CV-3248, 2007 WL 433397, at *11 (E.D.N.Y. Feb. 7, 2007) (quoting *Bryant v. Speckard*, 131 F.3d 1076, 1077 (2d Cir. 1997)) (internal brackets omitted)); *see also Felkner v. Jackson*, 131 S. Ct. 1305, 1307 (2011) (emphasizing that trial court's determination of the credibility of the prosecutor's proffer of the race-neutral reasons for exercise of peremptory strike is entitled to "great deference"); *Batson*, 476 U.S. at 98 n.21 ("Since the trial judge's findings in the [*Batson*] context . . . [will] largely [] turn on evaluation

of credibility, a reviewing court ordinarily should give those findings great deference.");
*Robinson v. Smith*, No. 09-CV-8222, 2011 WL 1849093, at *16 (S.D.N.Y. May 17, 2011)
(same), *adopted by* 2011 WL 3163466.

Here, Petitioner's first *Batson* claim relates to the prosecutor's use of one out of three
peremptory strikes against an African-American juror (Mr. Rogers) after the first round of voir
dire.  After Petitioner's attorney raised a *Batson* challenge (Apr. 2, 2002 Tr. 227-28), the
prosecutor stated that she had challenged only one of the two African-American jurors in the
group and that she had also challenged two white women, (*id.* at 228).  When the judge asked the
prosecutor for a race-neutral reason for striking Mr. Rogers (without finding that Petitioner had
made a prima facie case), the prosecutor said that the juror gave her one-word answers, did not
make eye-contact with her, and did make eye-contact with defense counsel, explaining that "[a]
person like that, in my estimation, is not going to listen to anything that I have to say, whether it
would be in my opening or my witnesses."  (*Id.* at 229-30.)  Petitioner's counsel stated that he
"did not notice any difference in the way that he answered [the prosecutor] from the way that he
answered me."  (*Id.* at 230.)  Petitioner's counsel also noted that the judge was in a good position
to ascertain whether the juror in fact did appear to be making eye contact with the prosecutor.
(*Id.*)  After listening to the parties' arguments, the trial judge held that the defense had not made
out a prima facie case, and that, in any event, the prosecution had provided a "valid neutral
reason" for the peremptory strike.  (*Id.*)

First, the Court need not review the trial judge's ruling that Petitioner failed to make out
a prima facie case because the prosecutor presented a race-neutral reason, and the trial judge
found that Petitioner had failed to show intentional discrimination.  *See Hernandez v. New York*,
500 U.S. 352, 359 (1991) ("Once a prosecutor has offered a race-neutral explanation for the

peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot."); *see also Ware v. Filion*, No. 04-CV-6784, 2007 WL 1771583, at *3 (S.D.N.Y. June 19, 2007) ("Where the prosecutor proffered an explanation for the peremptory challenge and the trial court [] made a ruling on the prosecutor's racial motivation, the reviewing court does not rule on the sufficiency of the petitioner's prima facie showing.").  Second, Petitioner has failed to show that the trial court's decision to accept the prosecutor's explanation with regard to the juror's lack of eye-contact was contrary to or involved an unreasonable application of *Batson* and its progeny.  Although Petitioner believes that a juror's eye-contact with the prosecutor is an insufficient reason for a peremptory challenge, the Second Circuit has held that a juror's demeanor is a valid race-neutral reason for exercising a peremptory challenge.  *See Green v. Travis*, 414 F.3d 288, 300 (2d Cir. 2005) ("[T]he unfavorable demeanor of a venireperson has been held to be a race-neutral explanation for a peremptory challenge."); *McCrory v. Henderson*, 82 F.3d 1243, 1247-48 (2d Cir. 1996) (peremptory challenges "may legitimately be based not only on answers given by the prospective juror to questions posed on voir dire, but also on the prosecutor's observations of the prospective juror"); *Brown v. Kelly*, 973 F.2d 116, 121 (2d Cir. 1992) ("An impression of the conduct and demeanor of a prospective juror during the voir dire may provide a legitimate basis for the exercise of a peremptory challenge."); *see also Wells v. Ricks*, No. 07-CV-6982, 2008 WL 506294, at *28 (S.D.N.Y. Feb. 26, 2008) (denying habeas petition and upholding peremptory challenge based on, inter alia, the juror's "hostile and unsettling demeanor," including answering questions with a hand in front of her face), *adopted by* No. 07-CV-6982, 2008 WL 2986503 (S.D.N.Y. Aug. 1, 2008); *Giles v. Kuhlmann*, No. 98-CV-7368, 2002 WL 1751401, at *5, *7 (E.D.N.Y. July 11, 2002) (denying

22

habeas petition and upholding peremptory challenge based on, inter alia, the juror's "poor rapport and bad eye contact with" the prosecutor).  Moreover, Petitioner has failed to present sufficient evidence to overcome the presumption of correctness afforded to the trial judge's findings when his only argument is that, in his subjective opinion, the juror did look directly at the prosecutor and provided answers to her questions.  (Obj. unnumbered page 18); *see Valentine v. State of New York*, No. 04-CV-1411, 2006 WL 2135779, at *6 (S.D.N.Y. Aug. 1, 2006) (denying habeas petition where peremptory strike was based on the juror's demeanor, noting that "AEDPA mandates an enhanced level of deference to a state trial court's assessment of the credibility of a prosecutor's proffered justification"); *see also Barney v. Conway*, No. 03-CV-0758, 2010 WL 3081335, at *6 (W.D.N.Y. Aug. 6, 2010) (denying habeas petition regarding *Batson* challenge and noting that because the "petitioner ha[d] not come forward with any [] indicia of pretext on the part of the prosecutor, t[he] [c]ourt ha[d] no basis upon which to conclude that the trial court's factual determinations regarding the prospective juror's demeanor and the prosecutor's credibility were unreasonable").

Petitioner also objects to the state courts' determination that the prosecutor's use of two other peremptory challenges against African-American jurors was not contrary to or an unreasonable application of Supreme Court precedent.  During the second round of voir dire, after the prosecutor peremptorily struck Ms. Robinson, another African-American juror, and after the defense raised a *Batson* challenge, the prosecutor explained that she challenged the juror because she had a nephew who was, at the time, being prosecuted by the Westchester District Attorney's office (the same office prosecuting Petitioner).  (Apr. 2, 2002 Tr. 356-57.) The court denied the defense's *Batson* challenge.  (*Id.* at 357.)  The prosecutor subsequently exercised another peremptory challenge of an African-American woman, Ms. Davis, during

23

round two of voir dire.  (*Id.* at 368-69.)  Anticipating that the defense would raise a *Batson*

challenge, the prosecutor stated that she was striking the juror because the juror's brother was

being prosecuted by the Westchester District Attorney.  (*Id.*)  The defense raised a *Batson*

challenge, protesting that "three of four people have been black."  (*Id.* at 370.)  After requesting

and listening to arguments from both the prosecutor and Petitioner's attorney, the trial judge

again denied the defense's challenge.  (*Id.* at 369-71.)  The court explained its reasoning for

ruling against Petitioner on both the challenge to Ms. Robinson and Ms. Davis, stating that both

jurors had relatives who were "being prosecuted by the Westchester County District Attorney's

office, which [was] the office [] prosecuting [Petitioner]" and that this was a "permitted use of

[a] peremptory challenge" when the trial judge "d[id] not see any purposeful discrimination of a

cognizable class."  (*Id.* at 371.)

      Petitioner argues that the prosecution of a relative of an African-American juror should

not be an acceptable reason for a peremptory strike because "then almost any black or hispanic

person who lives in an inner-city environment would 9 times out of 10 be excluded [from the

jury]."  (Obj. unnumbered page 16).  However, courts have consistently found that the arrest or

prosecution of relatives of a juror is a valid reason for a peremptory challenge.  *See Huggins*,

2007 WL 433397, at *12 ("[T]he authority in th[e Second] [C]ircuit is overwhelmingly clear that

race or gender-neutral explanations based on the fact that a relative of a prospective juror had

been arrested or convicted of a crime, is acceptable under *Batson*."); *see also Green*, 414 F.3d at

300-01 (upholding peremptory strikes as race-neutral when based on the prosecutor's

explanation that the prospective jurors had relatives who had been convicted of drug offenses);

*Barbara v. Goord*, No. 98-CV-4569, 2001 WL 1776159, at *6 (E.D.N.Y. Dec. 27, 2001)

("Prosecutors routinely challenge [jurors whose family members had been recently prosecuted

by the authorities], regardless of race, fearing bias against the authorities.").  Although Petitioner

argues that the prosecutor's explanations were pretextual because the jurors stated that they

could be impartial, (Obj. unnumbered page 17-18), the trial court credited the bona fides of the

ADA's reasoning regarding the jurors' relatives being prosecuted by the same office as

Petitioner and found that it did not see purposeful discrimination, (Tr. 371).  Because Petitioner

has not presented any other evidence suggesting that the prosecutor's strikes were pretextual, he

has not presented sufficient evidence to overcome the state court's factual finding regarding the

prosecutor's motivations for challenging the jurors.  *See Barney*, 2010 WL 3081335, at *6

(upholding peremptory strike based on juror's son having been convicted of a crime twelve years

earlier, despite the juror stating that she could be impartial, because the trial court's judgment of

the juror's demeanor and the prosecutor's credibility was entitled to deference and not

unreasonable based on the record); *Montana v. Conway*, No. 03-CV-6643, 2007 WL 3046673, at

*18 (W.D.N.Y. Oct. 17, 2007) (upholding peremptory strike based on juror's family members

having been prosecuted for crimes, noting that trial court's determination of the prosecutor's

credibility should be given deference).  Accordingly, Petitioner's habeas petition with regard to

the *Batson* issue is denied.

      D.  Ineffective Assistance of Trial Counsel

      Petitioner claims that he was denied effective assistance of trial counsel because his

attorney (1) failed to advise him that the prosecution could use statements he made during the

proffer meetings against him if he later offered testimony inconsistent with those statements, (2)

allowed ADA Neary "to videotape the first Queen for a Day meeting without informing

Petitioner," (3) "neglected to obtain the p[a]rameters of the agreement between himself and

[ADA] Neary in writing," and (4) failed to tell Petitioner that "[ADA] Neary rel[ie]ved himself

of the case and passed it on to [ADA] Ward."  (Petition ¶ 12(C).)  Magistrate Judge Fox

concluded that, even assuming Petitioner's ineffective assistance claim had been exhausted, it

was without merit.  He concluded that Petitioner's counsel's failures did "not fall below a

reasonable standard of performance" because "[a] layman does not require the advice of an

attorney to know that he should not lie."  (R & R 14.)  Magistrate Judge Fox also noted that any

harm to Petitioner from his attorney's failures was speculative because he did not testify at trial,

and because the evidence of his guilt was "sufficiently overwhelming," so that had he testified,

"a jury was not likely to believe him even if he had not been impeached."  (*Id.*)  In his objections

to the R & R, Petitioner attempts to explain his failure to exhaust his ineffective assistance claim

and reiterates why, in his view, his counsel's conduct was "ineffective."  (Obj. unnumbered page

17.)

       As an initial matter, the Court notes that Petitioner did not raise any ineffective assistance

of trial counsel claims in state court.  All of Petitioner's ineffective assistance claims involve his

former trial attorney's advice to Petitioner or interactions with the District Attorney's Office

regarding the "Queen-for-a-Day" meetings, and, therefore, are matters not appearing on the trial

record.[5]  As a result, Petitioner might be able to return to state court to exhaust his ineffective

assistance claims in a collateral motion.  *See* N.Y. Crim. Proc. Law § 440.10(h); *see also*

*McLean v. Green*, No. 05-CV-5603, 2009 WL 4778824, at *17 (E.D.N.Y. Apr. 15, 2009) (noting

---

    [5] Although Magistrate Judge Fox noted that Petitioner's attorney testified during the *Huntley* hearing, the hearing focused on the Assistant District Attorneys' actions, not on the performance of Petitioner's attorney.  *See* N.Y. Crim. Proc. Law § 440.10 ("[T]he court must deny a motion to vacate a judgment when . . . [a]lthough sufficient facts appear on the record of the proceedings underlying the judgment to have permitted, upon appeal from such judgment, adequate review of the ground or issue raised upon the motion, no such appellate review or determination occurred owing to the defendant's unjustifiable failure to take or perfect an appeal . . . .").

that habeas petitioner "properly exhausted" his ineffective assistance claims regarding his trial

counsel's advice during plea negotiations "by raising it in his Section 440.10 motion"); *Diaz v.*

*Smith*, No. 04-CV-1337, 2007 WL 946196, at *4 n.6 (S.D.N.Y. Mar. 27, 2007) (noting that the

petitioner raised a claim of ineffective assistance of trial counsel regarding competent advice in

plea negotiations in a section 440.10 motion).  Nevertheless, a federal district court may deny an

unexhausted claim if it finds the claim to be meritless.  *See* 28 U.S.C. § 2254(b)(2) ("An

application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure

of the applicant to exhaust the remedies available in the courts of the State."); *see also Greiner v.*

*Wells*, 417 F.3d 305, 317 n. 14 (2d Cir. 2005) (rejecting ineffective assistance claim on the

merits, noting that the court need not reach the exhaustion issue); *McLean*, 2009 WL 4778824, at

*4 n.7 ("[A] habeas petition with exhausted and unexhausted claims — a mixed petition — may

in any event be denied on the merits.").

　　　　Pursuant to the well-known two-part test of *Strickland v. Washington*, a habeas petitioner

alleging ineffective assistance of counsel "must demonstrate (1) that his counsel's performance

fell below what could be expected of a reasonably competent practitioner; and (2) that he was

prejudiced by that substandard performance."  *Pearson v. Callahan*, 555 U.S. 223, 241 (2009);

*see also Torres v. Donnelly*, 554 F.3d 322, 325 (2d Cir. 2009).  "Counsel's performance must be

reviewed objectively and measured for reasonableness under prevailing professional norms."

*McLean*, 2009 WL 4778824, at *15.  "Even if counsel was deficient, the claim may be

established only if 'there is a reasonable probability that, but for counsel's unprofessional errors,

the result of the proceeding would have been different.'"  *Id.* (quoting *Strickland*, 466 U.S. at

694); *see also Torres*, 554 F.3d at 325 (noting that to succeed on an ineffective assistance claim,

"a defendant must show that the lawyer's performance fell below an objective standard of

27

reasonableness and that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different" (internal quotation marks omitted)).  Notably, "'a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support.'"  *McLean*, 2009 WL 4778824, at *15 (quoting *Strickland*, 466 U.S. at 696).  "A defendant is entitled to effective assistance of counsel during out-of-court proceedings such as plea negotiations . . . ."  *Id.* at *17.

Here, turning directly to the second prong, Petitioner has failed to show that prejudice resulted from the alleged deficiencies.  Petitioner's primary claims are that his attorney failed to advise him that his statements could be used for impeachment purposes and failed to get the terms of the "Queen-for-a-Day" meetings in writing.  However, the trial court found that Petitioner was amply warned by ADA Ward that his statements at the second and third "Queen-for-a-Day" meetings could be used for impeachment purposes, and that Petitioner acknowledged that he understood this warning.  This finding is supported by the *Huntley* hearing record.  As a result, no prejudice results from the attorney's failure to warn when Petitioner understood the terms of the second and third meetings prior to making any statements.  *See McLean*, 2009 WL 4778824, at *17-18 (finding that the petitioner was not prejudiced by counsel's alleged failure to properly advise him regarding a plea offer because petitioner understood the terms of the plea agreement); *Williams v. Duncan*, No. 03-CV-568, 2007 WL 2177075, at *22 (N.D.N.Y. July 27, 2007) (noting that, despite attorney's alleged failure to advise petitioner regarding the terms of a plea offer, the petitioner was aware of the terms of the offer after being informed of the terms by the judge).

More importantly, Petitioner has not shown any reasonable probability that but for his counsel's alleged failures, the result of the trial would have been different.  First, as Magistrate

Judge Fox points out, the evidence presented at trial of Petitioner's guilt was overwhelming, including the testimony of several eyewitnesses who identified Petitioner as the attacker. Second, Petitioner has presented no factual support for his speculative argument that *if* his counsel had properly advised him, he would not have made incriminating statements at the proffer meetings, he would have testified at trial, and the jury would have believed his testimony over that of the other witnesses.  Indeed, although Petitioner argues that the trial court's denial of his suppression motion "hindered [him] from defending [himself] against any allegation of guilt" (Obj. unnumbered page 17), he does not describe what testimony he could have provided to the jury that would have altered its verdict.  *See Polanco v. Rock*, No. 08-CV-1283, 2010 WL 2483287, at *11 (N.D.N.Y. June 4, 2010) (denying ineffective assistance habeas claim regarding counsel's alleged failure to advise petitioner of his right to testify when the "[p]etitioner [] offered no evidence demonstrating that his failure to testify prejudiced his defense"); *Davis v. Graham*, No. 06-CV-0659, 2010 WL 597960, at *8 (W.D.N.Y. Feb. 17, 2010) (denying ineffective assistance habeas claim regarding counsel's advice for petitioner to waive his right to testify when the petitioner had not shown that his proffered testimony would have changed the outcome of the trial in light of three eyewitnesses who saw petitioner attack the victim); *Thomas v. Zon*, No. 04-CV-471, 2009 WL 605231, at *12 (W.D.N.Y. Mar. 6, 2009) (rejecting claim that counsel's ineffectiveness prevented petitioner from testifying because petitioner did not offer any "proof or indication as to how his testimony would have changed the result of the trial"). Similarly, Petitioner has not shown how his attorney's failure to advise him regarding the videotaping of the first proffer session or the transfer of the case to ADA Ward in any way affected the outcome of the trial.  *Cf. Dunn v. Senkowski*, No. 03-CV-0364, 2007 WL 2287879, at *10 (N.D.N.Y. Aug. 7, 2007) (denying ineffective assistance habeas claim when the petitioner

"offered no proof [] indicat[ing] that he was prejudiced, in any way, by the purported conflict of interest").  Accordingly, Petitioner has not shown that his counsel's alleged deficiencies caused any prejudice, and, therefore, Petitioner's claim regarding this issue is denied.

### E.  Sufficiency of the Evidence

Petitioner also claims that he is entitled to habeas relief because his convictions for first degree assault were "against the weight of the evidence," when "[t]here was no risk of death incurred by the victim due to his injury."  (Pet. ¶ 12(D).)  Magistrate Judge Fox concluded that Petitioner's claim was meritless because the jury was entitled to believe evidence showing that the slash to the victim's face and neck left a seventeen-centimeter scar, required at least thirty sutures, and was close to the victim's facial nerve, jugular vein, and carotid artery.  (R & R 16-17.)  Petitioner's objections to the R & R reassert his argument that the convictions were against the weight of evidence, emphasizing that a physician testified that the victim's wound was "superficial."  (Obj. unnumbered page 18.)

Technically, a "weight of the evidence" claim is a New York state law claim, and it is therefore not cognizable on federal habeas review.  *See Castaldi v. Poole*, No. 07-CV-1420, 2013 WL 789986, at *8 (E.D.N.Y. Mar. 1, 2013) ("An 'argument that a verdict is against the weight of the evidence states a claim under state law, which is not cognizable on habeas corpus.'" (quoting *McKinnon v. Superintendent, Great Meadow Corr. Facility*, 422 F. App'x 69, 75 (2d Cir. 2011)).  But a related claim based on the "sufficiency of the evidence" is a cognizable federal constitutional claim derived from *Jackson v. Virginia*, 443 U.S. 307 (1979), and its progeny.  *See id.*  Thus, "[i]n light of petitioner's *pro se* status, the Court reviews the sufficiency of the evidence underlying his conviction."  *Id.*; *see also Black v. Conway*, No. 11-CV-480, 2012 WL 6629050, at *1-2 (S.D.N.Y. Dec. 20, 2012) (denying "sufficiency of the

evidence" claim and noting that "weight of the evidence" claim is not available on habeas review).

"In a challenge under 28 U.S.C. § 2254 to the evidentiary sufficiency of a state criminal conviction, . . . the applicant is entitled to habeas corpus relief only if no rational trier of fact could find proof of guilt beyond a reasonable doubt based on the evidence adduced at trial." *Ponnapula v. Spitzer*, 297 F.3d 172, 179 (2d Cir. 2002) (internal citations and quotation marks omitted); *see also Malik v. McGinnis*, No. 06-CV-3361, 2010 WL 3239216, at *13 (S.D.N.Y. Aug. 16, 2010) ("To prevail [on a sufficiency of the evidence claim], the [habeas] petitioner must show that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." (internal quotation marks omitted)).  As a result, Petitioner "bears a very heavy burden in convincing a federal habeas court to grant a petition on the grounds of insufficient evidence."  *Ponnapula*, 297 F.3d at 179.  "The reviewing court is required to consider the evidence in the light most favorable to the prosecution, and draw all inferences in its favor."  *Johnson v. Ercole*, No. 07-CV-581, 2010 WL 3338584, at *4 (N.D.N.Y. July 28, 2010); *see also Dixon v. Miller*, 293 F.3d 74, 81 (2d Cir. 2002) ("A defendant challenging the sufficiency of the evidence supporting his conviction bears a heavy burden because the government receives the benefit of having all permissible inferences drawn in its favor." (internal quotation marks and citation omitted)).  "When considering the sufficiency of the evidence of a state conviction, a federal court must look to state law to determine the elements of the crime."  *Ponnapula*, 297 F.3d at 179 (internal quotation marks and brackets omitted); *Gibbons v. Ercole*, No. 05-CV-9413, 2010 WL 3199869, at *3 (S.D.N.Y. Aug. 12, 2010) (same).

In New York, a defendant can be guilty of first-degree assault if "[w]ith intent to cause serious physical injury to another person, he causes such injury" using "a deadly weapon or a dangerous instrument," or "[w]ith intent to disfigure another person seriously and permanently . . . he causes such injury to" another person.  N.Y. Penal Law § 120.10; *see Johnson*, 2010 WL 3338584, at *4 ("Under New York law, a person is guilty of Assault in the First Degree when, [1] with intent to cause serious physical injury to another person, [2] he causes such injury to such person or to a third person [3] by means of a deadly weapon or a dangerous instrument." (internal quotation marks omitted)).  "'Serious physical injury' means physical injury which creates a substantial risk of death, or which causes death or serious and protracted disfigurement, protracted impairment of health or protracted loss or impairment of the function of any bodily organ."  N.Y. Penal Law § 10.00(10).

The Court agrees with Magistrate Judge Fox that Petitioner's sufficiency claim fails. Although Petitioner argues that the slash to his victim's face and neck could not have caused "serious physical injury" because the victim drove himself to the hospital and was not in danger of dying, the trial record contains evidence that the victim suffered a seventeen-centimeter long facial laceration extending from his eye to his neck, the injury required at least thirty sutures and caused a permanent scar, and the wound was painful and required repeated medical treatment for infections.  (Trial Tr. 693-95.)  Moreover, to the extent Petitioner relies on the physician's testimony that the wound was "superficial" (Trial Tr. 882), the jury was entitled to credit the physician's additional testimony that he meant that the wound was "superficial to [a] particular muscle," that he "wouldn't characterize [the wound] as a superficial wound," (*id.* at 887-88), and that there was a risk, in the case of a wound penetrating the carotid artery or internal jugular and remaining untreated, of the victim bleeding to death, (*id.* at 883-84).  Based on this evidence, and

32

construing all inferences in favor of the prosecution, the jury could reasonably have found that the victim suffered a "protracted disfigurement" or "serious and permanent disfigurement."  *See Johnson*, 2010 WL 3338584, at *4 (denying habeas petition based on claim that conviction was not based on sufficient evidence of a substantial injury because the evidence showed that the victim suffered a protracted disfigurement when "the jury was shown a facial scar running from the victim's ear to his mouth as a result of the attack" (internal quotation marks omitted)); *see also Howard v. McGinnis*, 632 F. Supp. 2d 253, 276 (W.D.N.Y. 2009) (citing cases explaining that visible scarring satisfies the "serious physical injury" element of first degree assault in New York); *People v. Bailey*, 713 N.Y.S.2d 535, 535-36 (App. Div. 2000) (finding that first degree assault convictions were "based on legally sufficient evidence" because "[e]vidence that each of the complainants had multiple lacerations on the face and neck that required numerous sutures and left permanent scars that were viewed by the jury established the element of serious physical injury"); *People v. Wade*, 590 N.Y.S.2d 245, 246 (App. Div. 1992) (upholding first degree assault conviction when the evidence showed that the defendant "cut the victim's face with a razor, requiring stitches across his face from his ear to his mouth, and leaving a scar which was visible eight months after the incident took place").  Accordingly, Petitioner's habeas petition on this issue is denied.

    F.  Challenge to Petitioner's Sentence

        Finally, Petitioner argues that his sentence of nineteen years imprisonment was "unduly harsh and excessive."  (Petition ¶ 12(E).)  Magistrate Judge Fox recommended that Petitioner's claim be dismissed because he "has presented nothing to demonstrate that the sentence imposed is not within the range prescribed by state law."  (R & R 18.)  Petitioner's objections to this conclusion reiterate the arguments he made before Magistrate Judge Fox, stating that the

sentence is unduly harsh because, inter alia, the victim suffered a laceration that was not life threatening and Petitioner does not have a lengthy criminal record.  (Obj. unnumbered pages 25-26.)

Petitioner failed to raise the sentencing issue in his direct appeal to the Appellate Division and the Court of Appeals, and, as a result, he has failed to exhaust this claim in state court.  Furthermore, because Petitioner's complaint relates to a matter that was fully developed on the trial record, he cannot pursue a N.Y. C.P.L.R. § 440.10 motion.  *See Sweet v. Bennett*, 353 F.3d 135, 139 (2d Cir. 2003) ("New York law requires a state court to deny a motion to vacate a judgment based on a constitutional violation where the defendant unjustifiably failed to argue the constitutional violation on direct appeal despite a sufficient record."); *see generally* N.Y. C.P.L.R. § 440.10(2)(c).  Therefore, Petitioner's claim is deemed exhausted and procedurally defaulted.  *See Clark*, 510 F.3d at 390 ("[W]hen a petitioner failed to exhaust state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred, the federal habeas court should consider the claim to be procedurally defaulted" (internal quotation marks omitted)); *see also Bennett*, 353 F.3d at 140 (finding that the petitioner's habeas claim was procedurally defaulted when he "unjustifiably failed to argue [his] ineffective assistance claim on direct appeal [in state court] despite a sufficient record, and consequently waived the claim under § 440.10(2)(c)").  Indeed, Petitioner admits that his sentencing claim has "been procedurally barred."  (Obj. unnumbered page 6.)  Petitioner has not asserted any cause for his default, nor asserted any facts suggesting that "failure to consider the claim will result in miscarriage of justice, i.e., th[at] [he] is actually innocent."  *Bennett*, 353 F.3d at 141.  As a result, Petitioner's claim is procedurally defaulted.  *See id.* (dismissing claim as procedurally defaulted when the

petitioner did not show cause and prejudice for the default or actual innocence); *see also Robles v. Brandt*, No. 08-CV-6115, 2010 WL 2925973, at *7 (W.D.N.Y. July 23, 2010) (dismissing petitioner's unexhausted claim as procedurally defaulted when he "ma[de] no showing of the requisite cause and prejudice necessary to overcome the procedural default, nor . . . . demonstrated that [a] failure to consider the claim would result in a miscarriage of justice").

In any event, as Magistrate Judge Fox explained, claims of an unduly harsh sentence do not raise a cognizable federal constitutional issue if the sentence was within the range prescribed by state law.  (R & R 17-18); *see White v. Keane*, 969 F.2d 1381, 1383 (2d Cir. 1992) ("No federal constitutional issue is presented where . . . the sentence is within the range prescribed by state law."); *see also Diaz v. Herbert*, 317 F. Supp. 2d 462, 479-80 (S.D.N.Y. 2004) (same); *Gonzales v. Travis*, 172 F. Supp. 2d 448, 457 (S.D.N.Y. 2001) ("It is well established that, when a sentence falls within the range prescribed by state law, the length of the sentence may not be raised as grounds for federal habeas relief." (internal quotation marks omitted)).  Here, Petitioner was sentenced to nineteen years imprisonment for his conviction of assault in the first degree (the highest of his concurrent sentences), which is a Class B felony with a maximum sentence of twenty-five years.  *See* N.Y. Penal Law § 120.10; N.Y. Penal Law § 70.00.  Accordingly, Petitioner's sentence was within the range proscribed by New York State law and, therefore, his habeas petition is denied.  *See Diaz*, 317 F. Supp. 2d at 480 (dismissing habeas claim because "there [wa]s no federal constitutional violation to warrant habeas relief from the trial court's imposition of consecutive sentences because the sentences d[id] not violate state law"); *Gonzales*, 172 F. Supp. 2d at 457 (dismissing habeas petitioner's claim regarding a harsh and excessive sentence when the sentence was within the statutory range).

35

G. Appealability

Petitioner may not appeal this order unless "a circuit justice or judge issues a certificate of appealability." 28 U.S.C. § 2253(c)(1). A certificate will be granted "if the applicant has made a substantial showing of the denial of a constitutional right." *Id.* § 2253(c)(2); *see generally United States v. Perez*, 129 F.3d 255, 259-60 (2d Cir. 1997) (discussing the standard for issuing a certificate of appealability). The Court finds that Petitioner has not met this burden. Thus, the Court declines to issue a certificate of appealability.

### III. Conclusion

Having reviewed de novo the claims raised in Petitioner's objections to the R & R, the Court finds that none of Petitioner's claims warrants habeas relief. In addition, because Petitioner has not made a substantial showing of the denial of a constitutional right, the Court declines to issue a certificate of appealability.

Accordingly, it is hereby

ORDERED that the R & R is ADOPTED as noted herein; and it is further

ORDERED that the Court declines to issue a certificate of appealability; and it is further

ORDERED that the Petition is DISMISSED; and it is further

ORDERED that the Clerk of the Court is respectfully directed to enter a judgment in favor of Respondents and to close this case.

SO ORDERED.

Dated: June 4, 2013
White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

36

Service List

For Mailing by Clerk's Office:

Nigel McCall
02-A-3390
Coxsackie Correctional Facility
Box 200 West
Coxsackie, NY 12051-0200

John J. Sergi, Esq.
Office of the District Attorney
Westchester County Courthouse
111 Martin Luther King Jr. Blvd.
White Plains, NY 10601

Joseph M. Latino, Esq.
Office of the District Attorney
Westchester County Courthouse
111 Martin Luther King Jr. Blvd.
White Plains, NY 10601